Alright, our next case is Billhartz v. Billhartz. And I understand the athletes have divided up their times, so Council, please proceed. Mr. Sampson? Sampson, yes. Sampson, thank you. My name is Don Sampson. I'm a police deport. I represent the Atellus in this case. I'm delighted to be here in the 5th District. I'm actually from a little town called El Paso, Illinois, which is up near Bloomington. We're down about 2,500 people. I grew up and occasionally hear about Mount Vernon, and I thought Mount Vernon was about the same size as El Paso. But I get down here and I see it's a booming metropolis. El Paso is still at 2,500 people, so it's just a delight to be here. Well, I know the court has read the briefs, and I'm not going to go into the background of the overall litigation involving enforcement of the Bill Hart's trust. We'll just focus on the issues in this appeal, and those issues have to do with the enforceability of an alleged oral agreement pursuant to the party's mediation agreement and the Uniform Mediation Act. I want to talk about the agreement and the act, but before I get there, I think it's important to highlight some language from the Appley's briefs in this case. I'm looking at language here on page 13 of Marsha's brief. The same language appears on page 6 of Eileen's brief, and here's what it says. Quote, all of the parties clearly understood in agreement prior to the mediation that a written settlement agreement would necessarily have to be drafted and signed after the conclusion of the mediation in order to incorporate the terms of the party's agreement, including the sale of an economic sign. I think the important language there is written settlement agreement necessarily have to be drafted and signed. Now Webster defines the term necessary as essential, required, or indispensable. So the opening question here on appeal is whether a signed agreement ever resulted from the mediation, and the answer to that is no, it did not. There's no fact dispute on that. So this necessary, this indispensable aspect of the party's agreement is missing, and that alone, I suggest to your honors, requires reversal of the order enforcing an alleged oral agreement. Now, I'm not going to stop there. I think I could, but I'm going to go forward to talk about the mediation agreement and mediation act, because I think those reinforce the necessity of a signed agreement. But the admission from the appellees here provides the context in which this appeal arises and completely disposes of any common law arguments relied upon by them, such as the Lampe case and some of the other cases in which an oral agreement was, in fact, enforced, but where the court found that a written agreement, signed agreement, was not necessary. It is necessary here, and the appellees have so admitted. Is there any circumstance in your view for an oral agreement arising out of mediation to be enforceable? Not unless there is a waiver by the parties with respect to the various mediation privileges, and not in this case, because the mediation agreement specifically said it was a nonbinding mediation, and now the appellees are trying to bind my client, Gene, to that. Well, all mediation is nonbinding, isn't it? All mediation is nonbinding. It's not like arbitration. I think that's another reason why enforcement of an oral agreement is inappropriate. Well, some cases are more simple than others. Maybe you've got a personal injury case, and the agreement is we settle for $50,000, and you can just handwrite that and don't sign it. You've got a signed agreement. In that kind of circumstance, where the only terms are how much do you pay, would it be your argument that in a mediation context, an oral agreement would be unenforceable? It wouldn't be unless there is a waiver of mediation privileges under the Uniform Mediation Act. Unless you did write that down, $50,000, we both agree, sign it. It's got to be a signed writing, the Uniform Mediation. Okay. And it's doubly important in this case because we have not only the Act, but we also have a separate mediation agreement. And by mediation agreement here, I'm not talking about the memorandum of settlement that was developed on the night of the mediation. I'm talking about the three-, four-page document that was actually signed by all the parties. That's a pre-mediation agreement. It's a pre-mediation agreement. It's entitled Mediation Agreement, so I'll refer to it as Mediation Agreement, but it's actually a pre-mediation agreement, which constitutes a signed writing because it was signed by all the parties to the mediation. And let me talk about that and the mediation act for just a moment here. Both are similar in that they have broad prohibitions and then narrow exceptions to the prohibitions, broad prohibitions concerning what is enforceable, what is admissible in court. In the mediation agreement, and I'm looking here at just two paragraphs. I'll focus on two paragraphs here. I set these forth at page 10 of our opening brief. If your honors want to follow along here, I'm going to be looking at paragraph D as in Don and G as in Joel. Paragraph D says, it starts out, I think, just what we were talking about, that each party agrees to submit a dispute for a non-binding mediation. But then it goes further. It says, all offers, promises, and statements, whether oral, I'm sorry, whether written or oral, and I'm going to skip some language, sub one, shall be considered confidential, and sub two, shall be deemed inadmissible in any judicial proceeding. Now, offers, promises, and statements is very broad. Statements alone encompasses oral agreements. In order to have an agreement, you have to have statements from each side. You have to have a statement concerning the offer, another statement regarding the acceptance, statements going back and forth as to what are the terms of the agreement. Promises also encompasses agreements. Agreement is an exchange of promises. So that language, I suggest, Your Honor, encompasses just about anything that could have occurred at the mediation. Can that be waived? It can't be waived. It was not waived in this case in any way. I think the athletes are going to say, are saying that it was waived by your client's participation in the hearing to prove up the agreement. Well, and I will get to that, Your Honor, when we talk about the mediation act. But she was responding to a variety of arguments they made concerning the enforcement of this alleged oral agreement. What could she do except to object? And she did object to their various submissions to the court. She moved to strike those various submissions, and she established through her own submissions that there was, in fact, no signed right. And that's all she had to do. She in no sense made a waiver. And when we talk about the mediation act, it requires a signed waiver or a waiver of record, and there was no signed waiver by all the parties. An express signed waiver is what I believe the mediation act talks about. And I'll get there in just a moment. But I don't think that anything that she did was constituted a waiver. The exception, then, in the mediation agreement is paragraph G. And it applies to, quote, any executed written settlement agreement shall be considered binding on the parties and may be enforced. So a signed right is enforceable, and therefore it's admissible in court. And there's no complication. There's no misunderstanding as to the interaction of these two provisions. One is a broad prohibition. The other is the exception. Nothing complicated about it. The appellees here try to complicate it. They say, for example, that I misquoted paragraph G, but I've said, of course, paragraph G is very faithful. They argue that all agreements ought to be enforceable under paragraph G because they say they're not expressly prohibited under paragraph G. Well, they aren't expressly prohibited under paragraph G, but they are prohibited under paragraph D. The only exception in paragraph G is for signed written agreements. And by trying to shoehorn into paragraph G a reference to oral agreements, they're actually asking this court to rewrite the agreement on the parties. And this court can't do that. Under the Pritchett case, which the appellees have signed, and other cases that say that courts can't do that. So that's the mediation agreement. It clearly applies and permits the enforceability only of signed agreements. Let's talk for a moment about the Mediation Act. And that too has a similar structure. It has broad prohibitions and then narrow exceptions. The broad prohibition is contained in section 4 sub A of the Mediation Act. I've set forth certain sections of the Act in my opening brief at pages 2 to 3. I didn't set forth all of the various exceptions that the appellees rely upon because I didn't know what they would be relying upon. But some of this language is at pages 2 to 3. Section 4A says, subject to some exceptions, quote, a mediation communication is privileged. Now let's stop there. What is a mediation communication? Well, it's defined in section 2 sub 2. And it's defined there as a statement, whether oral or in a record or verbal or nonverbal. So there again we see that broad term statement. Getting back to section 4A. So a mediation communication is privileged and is not admissible in evidence in a proceeding. And a proceeding is defined in the Act to include a judicial proceeding. As to broad prohibition, the narrow exception is in section 6A of the Act. And it states as follows. There is no privilege under section 4 for a mediation communication that is sub 1 in an agreement evidenced by a record signed by all parties. It's very similar to paragraph G of the mediation agreement, a signed right. Once again, there's no complication between how those two sections work, broad prohibition and a narrow exception. Now the Mediation Act has some additional exceptions. And I would suggest at the outset of talking about this that none of those exceptions ought to be applicable here, only because the parties agreed by a signed right, a mediation agreement we just talked about, as to what would be admissible and what would be enforceable. And there's no other exceptions in that mediation agreement. But nevertheless, the appellees rely upon some of the exceptions to the Mediation Act. So let's talk about briefly some of the exceptions that they rely upon. One is contained in section 3A of the Act. I'm sorry, 3C of the Act. And it says if the parties agree in advance in a signed record that all or part of a mediation is not privileged, the privileges under sections 4 and 6 do not apply. So there's a waiver section. Yes, it can be waived. Section 3C requires a signed record or waiver. There is no signed record here waiving any privileges. Now Marcia's brief argues that under paragraph D of the mediation agreement, that constitutes a signed record of waiver. But we looked at paragraph D. There's nothing in there that waives anything. In fact, paragraph D of the mediation agreement imposes a privilege. It doesn't waive any privileges. Section 3C clearly provides no avenue for enforcement of an oral agreement. The appellees also rely upon section 5B of the Mediation Act. And here's what section 5B says. I'm going to paraphrase a little bit here. It says a person that discloses inappropriately a mediation communication which prejudices someone else can't be heard to complain if the other person, someone else, responds in kind. And that apparently is the language that the appellees are relying upon here in trying to justify the significant mediation communications that were introduced in the September 23, 2013 hearing. And they say that Jean herself first disclosed mediation communications and that therefore they are entitled to respond in kind. The problem with that argument is tiny. The appellees submitted their motion to enforce the alleged oral agreement in August of 2013. Jean didn't respond to that until about a month and a half later in September of 2013. And the motion itself was an attempt to enforce this alleged oral agreement that arose at the mediation. And the only possible way that the appellees could have enforced that agreement would be by the disclosure of substantial mediation communications. There's no way else to prove them the alleged oral agreement. And that's exactly what they attempted to do in their motion to enforce and the submissions filed in support of that motion. And your honors don't have to take my word for it. We can just look at the record. And in particular, one of the affidavits submitted in support of the motion to compel, the affidavit of Mr. Shuver. I'm not accusing anybody of any bad faith here. All I'm suggesting to your honors is that there are significant disclosures of mediation communications in Mr. Shuver's affidavits.  You probably don't have it in front of you. I'll just summarize a couple paragraphs here. Paragraph 10. He says, throughout the course of the mediation, various settlement proposals were exchanged between departments. I suggest to your honors that that is a disclosure of mediation communication. To exchange a proposal, you have to have statements. You have to have oral promises. Or oral commitments of some kind. He goes on. He says, the terms of these proposals were exchanged in writings transmitted between departments. He goes on to say, said writings are included but were not limited to. And then he lists eight categories of writings that were exchanged. Those were all mediation communications. He goes on to paragraph 11. He says, after many hours of negotiations, a settlement offer was presented by Ward Billbox. The presentation of a settlement offer is a mediation communication. It's a statement. I'm offering this. Paragraph 12. That settlement offer that was presented by Ward was accepted by certain other departments to the mediation. So far, I haven't heard any detailing of what any of those offers were or what any of the negotiations were. So far, it's just saying offers were made. It doesn't say anything about what they were. Well, the next paragraph does make a disclosure. I'm not saying it provides a detailed line-by-line explanation of what an offer is, but paragraph 13. The settlement offer that was accepted included the following terms. And then the affidavit discusses in general terms what those terms were. Paragraph 14. After the offer and acceptance of the settlement agreement, Judge Hittas, who was the mediator, and I, and Mr. Schubert, went into a conference room where there were other people, and, quote, everyone confirmed that a settlement had been agreed to, unquote. I suggested, Your Honors, that all those communications, the confirmation of a settlement as a mediation communication, and, yeah, I'm not saying that they talked about the interest rates or the applicable valuation date or that's not disclosed here, but these are all mediation communications. What could Jeanne possibly do in response? Well, what she did, she filed her objections in about the middle of September. Counsel, your time has expired. I was having such a good time, Your Honors. I just, time got the better of me. And you'll get rebuttals. Okay, well, I'll stop right there. All right, thank you, Counsel. Thank you. All right. Let's hear from the appellees. Whoever would like to go first. Thank you. May it please the Court, my name is Brian Clark. I represent Appellee Eileen Hoffman. I will discuss issues and facts surrounding the mediation, the mediation agreement executed by the mediation parties, the inapplicability of the Uniform Mediation Act, which I'll call the UMA if that's okay with the judges, and the enforceability of the agreement to settle by the mediation parties. Judge Rarick will follow and discuss Rule 13 issues to the extent necessary, and Jay Bowring will follow me and discuss other policy issues. The mediation agreement that was executed by all the mediation parties prior to mediation was silent on the issue of oral settlements. It specifically made clear that any written settlement agreement would be binding on the parties, but it really cannot make any statements with regard to oral agreements because any oral agreement, if there's a disagreement, would require a court hearing of a judge to hear the various evidence and judge the credibility of the witnesses, as was done in this case by Judge McGlynn. In this court, Pritchett v. Asbestos Claims Management, the court said a court will not add another term about which an agreement is silent. No word can be added or taken from the agreement to change the plain meaning of the parties. We cannot add or subtract whether oral agreements are or are not permissible, and we certainly cannot make a claim or a statement that oral agreements are not permissible. simply because the mediation agreement stated that written ones are enforceable. More important, Judge Hippas authored the mediation agreement. He's been a judge for a long time and a mediator for a long time, and at no time did Judge Hippas request or insinuate that there would be no actual settlement until and unless there was a writing signed by all the mediation parties. And in fact, the record will show that after meeting with each of the parties, after the offer was made by Jean and her siblings and accepted by all of the other parties, that Judge Hippas went to each party in the room, shook their hands, and congratulated everyone on reaching the settlement. He certainly never said, well, there's no settlement until you guys write all this down and prepare a final document. And that's because— Now, is that in the record by—did he testify at the hearing? He did not. He did not. So it's in the record by the testimony of other participants of the mediation? Yes. Okay. And this goes to a point that Mr. Sampin made. All the mediation parties did agree that a written settlement agreement would necessarily need to be drafted subsequent to the mediation. But that was due to the complexity of issues surrounding the sale of closely held bank stock and the need to involve third parties, as well as the various and significant number of releases that needed to be included and executed, as well as the lateness of the hour. Please keep in mind this was a 14-hour mediation that ended at 11 o'clock p.m. in a snowstorm. Everyone was strongly desired to get out of there for the evening, and everyone felt everything was resolved. It wasn't until several weeks later that Jean decided we didn't have a settlement because she didn't sign anything that night. There was a lot of work on the written agreement that was put together after the mediation session. I understood back and forth for several weeks and several—is that correct? Absolutely. There were a number of revisions made and different versions that were created. However, it's very important for the court to understand that none of those various versions of the settlement agreement changed any substantive terms. There were minute, small changes in release language or exactly how we're going to try to work on selling this closely held bank stock. Very small matters. Everyone from the very beginning agreed on every material term of that settlement, and that was testified to at both the September and November hearings by every party other than Jean. Did Jean participate in that back and forth on the written agreement? Did she either individually or through her attorney? She did not. She refused to. At that point, she had already made her claim that because she hadn't signed anything the night of the mediation, she wasn't going to be involved in anything else. She was offered to be involved in that. Her attorney was provided initially copies of the agreements, but they refused to participate in going back and forth on the various— And I'm not sure I understand as well that that night or as the mediation went on, there was a short memorandum, like a three-page memorandum that was prepared by somebody, but that was not signed or initialed by any of the participants in the mediation. We started to prepare a memorandum, but because of the late hour and the snowstorm and the inability to try to find everything that could possibly be put into such a document, it was decided that it would be taken care of later. The court needs to also understand that every time there was an offer made, there was a very detailed term sheet prepared and distributed to each of the parties that went through all of the assets of the trust and how they might be sold and how the money would come and what percentage that would equate to. It was a very complex set of numbers and calculations that needed to be taken care of to come to a conclusion. But at the end of the mediation, all of those issues had been resolved, and the only issue remaining was what dollar amount the siblings would receive outside of the percentage of the trust they would get as stated in the trust. And that offer was made and initiated by Jeanne herself and accepted by everyone else. And that includes people on both sides of the equation, both plaintiffs, defendants, and in my client's case, a non-party who was also a beneficiary of the trust. As I noted, Paragraph D, which is also cited by Mr. Sample, makes certain communications privileged if they're made in the course of mediation. And it states that those particular statements are inadmissible only in an arbitration, an administrative case, an administrative or judicial proceeding. Those are the terms in the mediation agreement. This clearly envisions a hearing on the merits. When there's not a hearing on the merits, when the issue is simply was there a settlement, there needs to be a disclosure of what occurred during the mediation to determine whether that settlement indeed occurred. If the trial court rules that a settlement occurred, the case is over. If no settlement occurred pursuant to the ruling of the trial court, then those privileged communications are privileged as to any use of them in a hearing on the merits, whether that be an arbitration, an administrative proceeding on the merits, or a trial. It makes no legal sense to utilize the provisions of Paragraph D to prevent parties in a mediation from testifying that a settlement was reached. Otherwise, we end up in the situation we have now where a party to a settlement decides after the fact she doesn't like it. And so I'm going to go back and say because I didn't sign it, there's no settlement. I don't care what the other five parties who are there say. I'm going to put an end to the settlement because I say I don't want to sign anything. It would be a different story if it was one plaintiff and one defendant and we really had a swearing match. In this case, it's very important to note that we have plaintiffs and defendants and non-parties, including two of Jean's siblings who are in the exact same situation as she is, all of whom testified that there was a settlement, that the terms of the settlement were clear and absolute, and that the settlement agreement later created was perfectly in line with those ideals and statements made at the mediation, and everyone signed that settlement agreement except Jean. The Uniform Mediation Act, we do not believe, is applicable, and we don't believe it's applicable for several reasons. First and foremost, we believe the mediation parties opted out of the Mediation Act. The Mediation Act in Section 3 provides the ability for the parties to opt out. The parties to the mediation had their own guidelines in the mediation agreement as to what was and was not privileged and how things were to be taken care of.  There was no discussion of the Mediation Act before the mediation, at the mediation, or even after the mediation. It was first brought up on this appeal. That's the first time we heard about the Uniform Mediation Act. It's important to note that Representative Brosnahan, when the Uniform Mediation Act was enacted, made very clear that it is totally voluntary and the parties have to agree to this. In our case, the parties agreed to the mediation agreement that they executed. And did the agreement that the mediator presented, was it silent as to the application of the act or not? Absolutely. Absolutely. And like I said, more importantly, the mediator, when everybody agreed to the $1.45 million, made no statement whatsoever. It was very clear that the case was over. It was settled. He knew there was no writing at that moment and that it would come later. And he certainly did not inform the mediation parties that you've got to be careful if you don't have a settlement. He did address the office. Also, importantly, the waiver issue under the Uniform Mediation Act, if it applies, is extremely important. And I think the provisions in terms of waiver under the act have the same application under the mediation agreement. The motion to enforce that was filed by Marsha, and also the one that was filed with my client, mentioned no privileged communications that occurred in the mediation, including the affidavit of Mr. Schroeder. There were no specifics. The only time, the first time, that any specific communications from mediation were disclosed were by Jean. And she did vote for the motion in response to the motion to enforce, as well as an affidavit she filed prior to the September hearing. There's a very similar case that comes out of Delaware that involves the Uniform Mediation Act, United Health Alliance versus United Medical. There was a mediation. There was an oral agreement at mediation, and the parties attempted to finalize the mediation and to finalize the settlement documents through e-mail. When they couldn't do that, one of the parties sent to the court an e-mail that had gone back to court. The other party then filed an affidavit, and the court made clear that under those circumstances, there is waiver, and the court can hear all of the testimony as to what occurred at mediation so that the court is aware of what happened and can make a reasoned decision whether the settlement occurred or did not. In that case, the court stated that a party should not be able to waive confidentiality for communications that favor it, but assert confidentiality to preclude additional communications that undermine its position. Counsel, is that case cited in which brief? That's cited both in the Eileen Hoffman brief as well as Marcia's. All right. Thank you. In addition, there are exceptions to the Uniform Mediation Act in Section 6, and the most important exception is the use of mediation communications when that information is not otherwise available. Well, when is the most important time that that information is not otherwise available? It's when there was an oral settlement and the court needs to hear that the case was settled. That's the only way that Judge McGlynn could hear what happened at mediation is to disclose what happened. And again, as I stated before, there's no harm because had Judge McGlynn found that there was no settlement, the privilege goes back into effect, and when there's a hearing on the merits when this case goes to trial, none of the discussions at mediation are discoverable or admissible. There's also a case that's cited in our brief, Sharon Motor Lodge v. Tye, which is a Connecticut case. In a sense that it would not serve the policy considerations of encouraging settlement by mediation or the policy favoring disclosure if a party was able to use mediation proceedings to engage in behavior that is prejudicial to the rights of other parties and then use the mediation privilege to isolate himself or herself from liability. That's exactly what Jeanne is doing here. She is prejudicing every other party who spent the time, energy, and money to bring this matter to conclusion, including her sisters, and putting everyone at risk, particularly her and her sisters, that if this case goes to trial on the merits and they lose, that they get absolutely no money to sue in the terms of the trust. So she wants to bring mediation communications up when she feels they are beneficial to her, but then stand behind the shield of the privilege to say that no one else can discuss those same discussions. I think one of the more important and simplistic manner in which this Court can understand how difficult it would be for parties to move forward with mediation if this Court were to rule that no mediation communications can be brought up to enforce an oral settlement is to picture the same meeting taking place that took place on March 1 in the same office, but without a mediation agreement at all, without a mediator at all. All of the parties sitting in a meeting together, meeting for 14 hours, coming up to a conclusion that the case had been settled, and then one party decides they're not going to sign off. Under that situation, there's no doubt that the other parties would be entitled to file a motion to enforce that the Court would be entitled to have a hearing and hear all the evidence, judge the credibility of all the witnesses, and determine whether settlement had been reached, which is exactly what happened here. At the end of the day, this case is about whether Judge McGlynn made a finding based on an appropriate offer, acceptance, and meeting of the mind on all material terms, which is fully supported by the record. And for those reasons, Judge McGlynn's order should be approved. Thank you. Yes, who's next? Your Honor, I'm going to proceed to ask if I have permission to address the Court. You may. You may. We have your name on the affiliate. I'm sorry? Okay. Santa Cruz Superior Counsel, Director, and I'm the proverbiary. I represent the Appalachian Marshall Bill of Rights, and I'm going to discuss the Rule 13 contention, as well as the contention that the proceedings below are manifestly unfair to the Appalachian Bill of Rights. Supreme Court Rule 13 doesn't mention the continuance and rather speaks in terms of ensuring proper notice, and unless there's a substitution of an attorney, that rule requires the withdrawing attorney to give notice of the hearing and to advise the client to obtain other counsel or to file a supplemental appearance within 21 days. We contend that by filing pro se pleadings of substance, which are to dismiss, which are to describe, affidavits and so forth, even before the Goldenberg motion to withdraw was filed in court, the Chief Delamarche entered a supplemental appearance in the pro se pleading room as is provided in Supreme Court Rule 13. She continued filing these pleadings up to and including the hearing in November. The Goldenberg motion was in proper form. Ms. Delamarche had a notice of that motion. She was present at the hearing. Unlike the actual situation and the cases signed in by the appellant, although an advisor, of course, to enter within 21 days, she's already done that, we contend, by entering her pro se appearance by filing the pro se pleadings. My count, and what I want to get into, is that throughout the course of this litigation, Ms. Delamarche engaged in a pattern of discharging attorneys with regularity. At the time of mediation, Attorney Siegel, who represented her, was attorney number five. We're now up to attorney number 10. Judge McGlynn observed at the first hearing that if he did grant a continuance, he wasn't sure that she could find an attorney whom she could get along with. That that belief was well-founded because her next attorney, Ms. Goldman, lasted three weeks. The next attorney, number eight, Mr. Rigg, lasted one week. And I say this not to denigrate Ms. Delamarche, as I suggested in her plea, but rather to show you the situation that the trial court faced. I'd like to get into briefly some of the case law. We think that the Tustin-Milner case, we've cited as the closest there are of attorney-conspiring attorneys. There was a sharp continuance, way short of 21 days, but the court felt it was not an abuse of discretion not to grant a longer continuance because that litigant demonstrated an intent to proceed pro se, just as we have in this case. The Santa Cruz case cited by the appellant involves an all-judiciation order entered even before the client knew her attorney had withdrawn. You can face that thought if you want, counsel. And I think more importantly is page 14 of the appellant's brief, they refer to a case which we have cited, the Eric Gartner case, and they say that that case unequivocally says you must have 21-day continuance, but a closer reading of that case will show that that statement is a tribute to a third-district case offered by Justice Holtridge who says the provisions for continuance can be waived, and even more importantly, Justice Slater, in a special concurrence, says that there is no mandatory continuance provision in Rule 13, and it does not make use of discretion to deny continuance when a litigant is either unwilling or unable to find an attorney she deems satisfactory. Words which reflect directly upon this case. Thank you, counsel. We've got... Briefly, Your Honors, the Gartner-Shacker case also says, and I'll just quote from the case, it's at 366 Illett 3rd, 278, and page 289, it represents, quote, during this 21-day transition period after the attorney withdrawal, the circuit court should not render any rulings prejudicing the parties' rights. In the 21-day period here, I'm sorry, speak up, counsel, I'm having trouble here. In the 21-day period here, a trial was held, and various evidentiary rulings were taking place during that trial. We think that the failure to postpone the only trial in this case that took place for 21 days to allow Ms. Bill Hartz to obtain new counsel prejudiced her right. Anyone reading that transcript can't disagree that she was prejudiced by not having an attorney. Is there any limit on that? I mean, suppose the case is set for trial, party shows up, morning of trial, fires her attorney. Then it happens a second time, then a third time, then a fourth time. Is there not a point at which the court... Yes, there is. There is a point. Where's that point? I don't know. But we have it. We just did it here. Okay. And counsel talks about, Judge Rarick talks about all the attorneys Gene had. Gene had three attorneys of record in this case, as we pointed out in my brief. One was Mr. Dowling, who withdrew. A second was another attorney that she had at the outset of the case that withdrew. And the third was Mr. Goldberg that withdrew the data here. Now, I... She hadn't reached the point of firing multiple attorneys on multiple trial court days. She hadn't reached that point. I didn't mean that to be an example of what happened in this case. But I know in criminal cases, we've seen situations where defendants keep firing attorneys, and at some point, the court is allowed to say, you don't get another attorney. I couldn't agree more. There can be an abuse of the process. No question about it. And clients can do that as well as attorneys. But there was no abuse in this case. I heard Mr. Clark say that the athletes here did, in fact, agree to the necessity of, I think he said signed agreement, or he said necessity of an agreement, because of the complexity of the facts here. And it was a complex case. It was a case that screamed out for a signed written agreement. We don't have a signed written agreement. Mr. Clark would like to read the mediation act and the mediation agreement that was entered into here as if it doesn't exist. He wants to read oral agreements into both those, the act and the agreement. We don't need a uniform mediation act if that's what we're going to do here. I cited in my reply brief a reference to the CBA record, one of the few articles that construes the uniform mediation act, and it concludes, very briefly, quote, that courts from other jurisdictions have, quote, uniformly concluded that the mediation communication privilege bars any proof of an oral settlement, unquote. My notes here, very quickly. The parties did not opt out of the uniform mediation act. And it was, in fact, raised in the trial court law. I'll just refer briefly to the pages C182 to 183 of the trial court record, where Gene specifically made reference to the uniform mediation act. However, if the act doesn't apply then the mediation agreement does apply. And all of these exceptions to the mediation act that the appellees are trying to rely upon here for their justification for admitting mediation communications, none of those exceptions apply if the act does not, in fact, apply. So the only thing that would have to go on would be the mediation agreement itself, which has no exception for disclosures by one side and then retaliation by the other side. Well, when does the act apply or not apply? Pardon me? When does the act apply or not apply? Do you have to sign an agreement before you start mediation that says the act does not apply or the act does apply? What's your understanding of some laws for that? No, you don't. You have to sign something that says that it does apply. It applies automatically, so far as I can tell, from the reading of the act. There's nothing that says that we have to formally invoke the protections of the mediation act that either applies or you opt out of them. And if the parties here opted out of the mediation act, these exclusions or the exceptions that the appellees are relying upon simply don't apply. Any other questions? Absent further questions, I appreciate the time. Counsel, thank you. Thank you for your briefs. We'll take this matter under advisement and we'll take a recess. Court will be in recess.